# EXHIBIT # 7

 **UNITED STATES POSTAL SERVICE** ®

Home | Help | Sign In

Track & Confirm        FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: 7009 1410 0000 6446 0772
Status: **Delivered**

Your item was delivered at 9:29 am on February 08, 2010 in SIMI VALLEY, CA 93063. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

· **Restore Offline Details >**     **Return to USPS.com Home >**

**Track & Confirm**

Enter Label/Receipt Number.

‹ **Go >**



# EXHIBIT # 8

 **UNITED STATES POSTAL SERVICE**®

Track & Confirm     FAQs

## Track & Confirm

### Search Results

Label/Receipt Number: **7009 1410 0000 6446 0741**
**Status: Delivered**

Your item was delivered at 9:17 am on February 05, 2010 in SIMI
VALLEY, CA 93063. A proof of delivery record may be available through
your local Post Office for a fee.

Additional information for this item is stored in files offline.

( Restore Offline Details >      Return to USPS.com Home >

**Track & Confirm**

Enter Label/Receipt Number.

Go >

Site Map    Customer Service    Forms    Gov't Services    Careers    Privacy Policy    Terms of Use    Business Customer Gateway

Copyright© 2010 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

---

**U.S. Postal Service**™
### CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

SIMI VALLEY CA 93063

| | |
|---|---|
| Postage | $ 1.39 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ 4.19 |

02/02/2010

Sent To: *Recontrust Company, NA*
Street, Apt No.; or PO Box No. *1800 Tapo Canyon Rd. CA6-914:01-*
City, State, ZIP+4 *Simi Valley CA 93063*

PS Form 3800, August 2006    See Reverse for Instructions

7009 1410 0000 6446 0741

# EXHIBIT # 9

**Bank of America** 

**Home Loans**

400 Countrywide Way
Mailstop CA6-919-02-22
Simi Valley, CA 93065

March 3, 2010

Scott McDaniel
25225 Cultus Lane
Bend, OR 97701

Re:    Borrower(s): Scott and Leah McDaniel
       Property Address: 25225 Cultus Lane, Bend, OR  97701
       Loan Number (s) 154164052

Dear Mr. McDaniel:

We are in receipt of your correspondence, which was received on February 5, 2010, by BAC
Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans"), f/k/a
Countrywide Home Loans Servicing, LP.

As you indicated to treat your correspondence as a Qualified Written Request under RESPA
section 6(e), we will comply in the time provided by the statute, which is as follows:

1. A loan servicer must provide a written response acknowledging receipt of a borrower's
   Qualified Written Request within 20 days (excluding Saturdays, Sundays and legal
   holidays) of receiving the Qualified Written Request.
2. Within 60 days (excluding legal holidays, Saturdays and Sundays) of receiving a
   Qualified Written Request, the servicer must resolve the complaint by correcting the
   account or giving a written statement of the reasons for its position.

If you have any questions, please contact:    Tracy Huffman
                                              (805) 577-3167

Sincerely,

*Kirsten Volmer*

Kirsten Volmer
Litigation Specialist
Foreclosure, Bankruptcy and Risk Management (FBRM)
Qualified Written Request (QWR) Group

# EXHIBIT # 10



direct dial number:
(215) 575-7290

Dilworth
Paxson

Adam L. Bliss
abliss@dilworthlaw.com

May 3, 2010

Scott McDaniel
Leah McDaniel
25225 Cultus Lane
Bend, OR 97701

Re:     Borrower(s): Scott McDaniel and Leah McDaniel (collectively, the "Borrower")
        Property Address: 25225 Cultus Lane, Bend, OR 97701
        Loan Number(s): 154164052 (the "Loan")

Dear Mr. and Ms. McDaniel:

This firm represents BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans"), f/k/a Countrywide Home Loans Servicing LP, with regard to the Loan. We are writing in response to your correspondence dated February 2, 2010 and March 4, 2010 (collectively, the "Letter"), wherein you request information regarding the Loan. Although couched as a "qualified written request," the information requested in the Letter goes well beyond that which is available through a qualified written request made under 12 U.S.C. §2605 ("QWR").

As you may be aware, a QWR is a written correspondence which includes a statement of specific reasons why the borrower believes that its account is in error and which provides sufficient detail to allow the servicer of the loan to review the borrower's account to determine whether there were errors made in connection with the account, and to either make appropriate corrections where errors were made or explain to the borrower why the servicer believes the account is accurate. A QWR is not a vehicle for a borrower to obtain confidential information concerning the lender's business practices, trade secrets or other proprietary information, nor can it be used to support a fishing expedition for documents that may support a claim or as a mechanism for seeking any other information which does not relate specifically to the borrower's loan. The Letter seeks information which goes well beyond that which is available through a QWR, while failing to provide any of the necessary detail regarding any specific error(s) made by the servicer in connection with the Loan.

The Letter also purports to require BAC Home Loans to respond to each of the Borrower's inquiries or waive certain of its rights, and further concludes, without any factual or legal support, that a failure to respond will confer certain rights upon the Borrower. Please be advised that BAC Home Loans is under no obligation to respond to the majority of the Borrower's inquiries, and expressly rejects any claim, conclusion or inference that it has somehow limited or waived any rights or remedies it may now or hereafter have, whether arising under the Loan documents, at law or in equity, as the result of its response, or lack thereof, to all or any portion

of the Letter, all of which rights and remedies are expressly reserved. BAC Home Loans also expressly rejects any claim, conclusion or inference that any failure by BAC Home Loans to respond to all or any portion of the Letter will cause any right, power or authority to be granted or bestowed upon, or otherwise inure to, the Borrower or any agent of the Borrower. Notwithstanding any failure by BAC Home Loans to respond to all or any portion of the Letter, the Loan documents shall remain enforceable as written and the respective rights and obligations of the parties shall remain unaffected.

Although the Letter is overly broad, unduly burdensome and not in conformity with 12 U.S.C §2605, we reviewed BAC Home Loans' file documents in an attempt to obtain information responsive to those of your inquiries which were consistent with 12 U.S.C §2605. We will address those of your inquiries which require a response in the same order as presented in the Letter as follows:

### 1.) Original Note and Chain of Transfer
With respect to your demand for evidence of the original note and a chain of transfer, you cite no authority that supports your claim that you are entitled to the information/documentation you request and we are not aware of the existence of any such authority. Accordingly, we respectfully decline this request. In lieu of allowing inspection of the original note, we have enclosed herewith a true and correct copy of the note.

### 2.) Document Copies
Enclosed are copies of the following documents:

        a)     Uniform Residential Loan Applications;
        b)     Appraisal Report;
        c)     Good Faith Estimate(s);
        d)     Deed of Trust;
        e)     Fixed/Adjustable Rate Rider;
        f)     Interest-Only Addendum to Adjustable Rate Rider;
        g)     Interest First Adjustable Rate Note;
        h)     Interest-Only Addendum to Adjustable Rate Promissory Note;
        i)     Truth in Lending Disclosure Statement(s);
        j)     Notice of Right to Cancel; and
        k)     HUD-1 Settlement Statement.

Your requests for all other documents and copies of checks have been declined, as such requests are either overly broad, do not concern the application of payments or the disbursement of funds, or do not relate to any specific acts of wrongdoing that you have alleged.

### 3.) Account Accounting and Servicing Systems
Enclosed is a Payment History that provides a detailed outline of transactions for the Loan during BAC Home Loans' servicing. Please note that this history provides pertinent information on payments received, tax and insurance payments disbursed, funds in the suspense/unapplied funds balance, and late charges assessed and paid. The Payment History is designed to be user-

Dilworth Paxson LLP                                                Page 3

friendly and there are no codes or terms used in the Payment History that require specific definitions.

To date, the fees that have been charged against the account and are not reflected in the Payment History are as follows: BPO fees, $95.00; and property inspection fees, $225.00. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**4.) Debits and Credits**
See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**5.) Mortgage and Assignments**
The current owner of the note is The Bank of New York Mellon f/k/a The Bank of New York, as Trustee for the Certificateholders CWALT, Inc. Alternative Loan Trust 2006-OC11, Mortgage Pass-Through Certificates, Series 2006-OC11, with an address of 101 Barclay Street, #22-7, New York, NY 10286. BAC Home Loans is the servicer of the Loan. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**6.) Attorney Fees**
See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**7.) Suspense/Unapplied Accounts**
See paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**8.) Late Fees**
Late charges are reported as interest paid effective with the 2008 tax year. Prior to the 2008 tax year, there was no interest paid or reported to the IRS relating to late charges assessed and paid to this account. See also paragraphs 2 and 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower,

Dilworth Paxson LLP

and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

### 9.) Property Inspections

Please review paragraph 3 above for the fees due in connection with property inspections performed. Please refer to the enclosed documents for information regarding the circumstances whereby property inspections may be performed. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

### 10.) BPO Fees

See the response to paragraph 3 above. The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

### 11.) Forced Placed Insurance

Per the terms and conditions of the aforementioned documents, forced placed insurance, also known as lender secured insurance, can be secured by the lender if notification is received via property inspections that indicates the property as being vacant during the delinquency of the loan. Lender secured insurance can also be placed if a borrower does not provide the lender with his preferred insurance information in a timely manner.

As of the date of this correspondence, no lender secured insurance has been purchased in connection with the Loan.

The remainder of these requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

### 12.) Servicing Related Questions

These requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

### 13.) Verification of Debt

To the extent the Letter can be construed as a request for verification of the debt, please be advised that the Loan is evidenced by an Interest First Adjustable Rate Note dated October 17, 2006 in the principal amount of $255,000.00, executed by the Borrower, in favor of Decision

Dilworth Paxson LLP                                             Page 5

One Mortgage Company, LLC, a copy of which is enclosed. The Loan is secured by a Deed of Trust dated the same date, a copy of which is enclosed. Please see paragraph 5 above for information concerning the current owner of the note. Please refer to the enclosed documents for additional information.

A payoff demand statement has been requested and will be forward to you under separate cover. This payoff demand statement will show all amounts necessary to pay off the Loan.

The Letter also includes a document titled "Conditional Acceptance of Your Offer Charging Me $257,000.00 and the Terms of Contract" (the "Acceptance"). The Acceptance asserts, without legal support, that BAC Home Loans' failure to provide the Borrower with the original promissory note will release BAC Home Loans' claim against the Borrower and will entitle the Borrower to damages in the amount of $765,000.00. Please see paragraph 1 above regarding your request for the original promissory note. Please also be advised that, notwithstanding anything in the Acceptance or the QWR, BAC Home Loans makes no admission of fraud or any other wrongdoing, the Loan documents shall remain enforceable as written, and the respective rights and obligations of the parties shall remain unaffected.

In providing the above response, BAC Home Loans is not limiting or waiving any rights or remedies it may now have or hereafter have, whether arising under the loan documents, at law or in equity, all of which rights and remedies are expressly reserved.

If you have further concerns or questions regarding this matter please contact BAC Home Loans' FREM Customer Escalation Team at (866) 200-9624.. Thank you for this opportunity to be of service.

                              Very truly yours,

                              Adam L. Bliss

Enclosures

# EXHIBIT # 11

This page is located on the U.S. Department of Housing and Urban Development's Homes and Communities Web site at http://www.hud.gov/offices/hsg/ramh/res/resp2605.cfm.



# 12 USC Section 2605 Servicing of Mortgage Loans and Administration of Escrow Accounts

From the U.S. Code Online via GPO Access
[wais.access.gpo.gov]
[Laws in effect as of January 27, 1998]
[Document not affected by Public Laws enacted between
January 27, 1998 and November 30, 1998]
[CITE: 12USC2605]



Information by State

Print version

## TITLE 12--BANKS AND BANKING

## CHAPTER 27--REAL ESTATE SETTLEMENT PROCEDURES

Sec. 2605. Servicing of mortgage loans and administration of escrow accounts

(a) Disclosure to applicant relating to assignment, sale, or transfer of loan servicing

Each person who makes a federally related mortgage loan shall disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.

(b) Notice by transferor of loan servicing at time of transfer

(1) Notice requirement

Each servicer of any federally related mortgage loan shall notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person.

(2) Time of notice

(A) In general

Except as provided under subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not less than 15 days before the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).

(B) Exception for certain proceedings

The notice required under paragraph (1) shall be made to the borrower not more than 30 days after the effective date of assignment, sale, or transfer of the servicing of the mortgage loan (with respect to which such notice is made) in any case in which the assignment, sale, or transfer of the servicing of the

mortgage loan is preceded by--
(i) termination of the contract for servicing the loan
for cause;
(ii) commencement of proceedings for bankruptcy of the
servicer; or
(iii) commencement of proceedings by the Federal Deposit
Insurance Corporation or the Resolution Trust Corporation
for conservatorship or receivership of the servicer (or an
entity by which the servicer is owned or controlled).

(C) Exception for notice provided at closing

The provisions of subparagraphs (A) and (B) shall not apply
to any assignment, sale, or transfer of the servicing of any
mortgage loan if the person who makes the loan provides to the
borrower, at settlement (with respect to the property for which
the mortgage loan is made), written notice under paragraph (3)
of such transfer.

(3) Contents of notice

The notice required under paragraph (1) shall include the
following information:
(A) The effective date of transfer of the servicing
described in such paragraph.
(B) The name, address, and toll-free or collect call
telephone number of the transferee servicer.
(C) A toll-free or collect call telephone number for (i) an
individual employed by the transferor servicer, or (ii) the
department of the transferor servicer, that can be contacted by
the borrower to answer inquiries relating to the transfer of
servicing.
(D) The name and toll-free or collect call telephone number
for (i) an individual employed by the transferee servicer, or
(ii) the department of the transferee servicer, that can be
contacted by the borrower to answer inquiries relating to the
transfer of servicing.
(E) The date on which the transferor servicer who is
servicing the mortgage loan before the assignment, sale, or
transfer will cease to accept payments relating to the loan and
the date on which the transferee servicer will begin to accept
such payments.
(F) Any information concerning the effect the transfer may
have, if any, on the terms of or the continued availability of
mortgage life or disability insurance or any other type of
optional insurance and what action, if any, the borrower must
take to maintain coverage.
(G) A statement that the assignment, sale, or transfer of
the servicing of the mortgage loan does not affect any term or
condition of the security instruments other than terms directly
related to the servicing of such loan.

(c) Notice by transferee of loan servicing at time of transfer

(1) Notice requirement

Each transferee servicer to whom the servicing of any federally
related mortgage loan is assigned, sold, or transferred shall notify
the borrower of any such assignment, sale, or transfer.

(2) Time of notice

(A) In general

Except as provided in subparagraphs (B) and (C), the notice
required under paragraph (1) shall be made to the borrower not
more than 15 days after the effective date of transfer of the
servicing of the mortgage loan (with respect to which such
notice is made).

(B) Exception for certain proceedings

The notice required under paragraph (1) shall be made to the
borrower not more than 30 days after the effective date of
assignment, sale, or transfer of the servicing of the mortgage
loan (with respect to which such notice is made) in any case in
which the assignment, sale, or transfer of the servicing of the
mortgage loan is preceded by--
(i) termination of the contract for servicing the loan
for cause;
(ii) commencement of proceedings for bankruptcy of the
servicer; or
(iii) commencement of proceedings by the Federal Deposit
Insurance Corporation or the Resolution Trust Corporation
for conservatorship or receivership of the servicer (or an
entity by which the servicer is owned or controlled).

(C) Exception for notice provided at closing

The provisions of subparagraphs (A) and (B) shall not apply
to any assignment, sale, or transfer of the servicing of any
mortgage loan if the person who makes the loan provides to the
borrower, at settlement (with respect to the property for which
the mortgage loan is made), written notice under paragraph (3)
of such transfer.

(3) Contents of notice

Any notice required under paragraph (1) shall include the
information described in subsection (b)(3) of this section.

(d) Treatment of loan payments during transfer period

During the 60-day period beginning on the effective date of transfer
of the servicing of any federally related mortgage loan, a late fee may
not be imposed on the borrower with respect to any payment on such loan
and no such payment may be treated as late for any other purposes, if
the payment is received by the transferor servicer (rather than the
transferee servicer who should properly receive payment) before the due
date applicable to such payment.

(e) Duty of loan servicer to respond to borrower inquiries

(1) Notice of receipt of inquiry

(A) In general

If any servicer of a federally related mortgage loan
receives a qualified written request from the borrower (or an
agent of the borrower) for information relating to the servicing
of such loan, the servicer shall provide a written response
acknowledging receipt of the correspondence within 20 days
(excluding legal public holidays, Saturdays, and Sundays) unless

the action requested is taken within such period.

(B) Qualified written request

For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

(2) Action with respect to inquiry

Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--
(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

(3) Protection of credit rating

During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of title 15).

(f) Damages and costs

Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

(1) Individuals

In the case of any action by an individual, an amount equal to
the sum of--
(A) any actual damages to the borrower as a result of the
failure; and
(B) any additional damages, as the court may allow, in the
case of a pattern or practice of noncompliance with the
requirements of this section, in an amount not to exceed $1,000.

(2) Class actions

In the case of a class action, an amount equal to the sum of--
(A) any actual damages to each of the borrowers in the class
as a result of the failure; and
(B) any additional damages, as the court may allow, in the
case of a pattern or practice of noncompliance with the
requirements of this section, in an amount not greater than
$1,000 for each member of the class, except that the total
amount of damages under this subparagraph in any class action
may not exceed the lesser of--
(i) $500,000; or
(ii) 1 percent of the net worth of the servicer.

(3) Costs

In addition to the amounts under paragraph (1) or (2), in the
case of any successful action under this section, the costs of the
action, together with any attorneys fees incurred in connection with
such action as the court may determine to be reasonable under the
circumstances.

(4) Nonliability

A transferor or transferee servicer shall not be liable under
this subsection for any failure to comply with any requirement under
this section if, within 60 days after discovering an error (whether
pursuant to a final written examination report or the servicer's own
procedures) and before the commencement of an action under this
subsection and the receipt of written notice of the error from the
borrower, the servicer notifies the person concerned of the error
and makes whatever adjustments are necessary in the appropriate
account to ensure that the person will not be required to pay an
amount in excess of any amount that the person otherwise would have
paid.

(g) Administration of escrow accounts

If the terms of any federally related mortgage loan require the
borrower to make payments to the servicer of the loan for deposit into
an escrow account for the purpose of assuring payment of taxes,
insurance premiums, and other charges with respect to the property, the
servicer shall make payments from the escrow account for such taxes,
insurance premiums, and other charges in a timely manner as such
payments become due.

(h) Preemption of conflicting State laws

Notwithstanding any provision of any law or regulation of any State,
a person who makes a federally related mortgage loan or a servicer shall
be considered to have complied with the provisions of any such State law
or regulation requiring notice to a borrower at the time of application
for a loan or transfer of the servicing of a loan if such person or

servicer complies with the requirements under this section regarding timing, content, and procedures for notification of the borrower.

(i) Definitions

For purposes of this section:

(1) Effective date of transfer

The term `` effective date of transfer'' means the date on which the mortgage payment of a borrower is first due to the transferee servicer of a mortgage loan pursuant to the assignment, sale, or transfer of the servicing of the mortgage loan.

(2) Servicer

The term `` servicer'' means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan). The term does not include--
(A) the Federal Deposit Insurance Corporation or the Resolution Trust Corporation, in connection with assets acquired, assigned, sold, or transferred pursuant to section 1823(c) of this title or as receiver or conservator of an insured depository institution; and
(B) the Government National Mortgage Association, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Resolution Trust Corporation, or the Federal Deposit Insurance Corporation, in any case in which the assignment, sale, or transfer of the servicing of the mortgage loan is preceded by--
(i) termination of the contract for servicing the loan for cause;
(ii) commencement of proceedings for bankruptcy of the servicer; or
(iii) commencement of proceedings by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation for conservatorship or receivership of the servicer (or an entity by which the servicer is owned or controlled).

(3) Servicing

The term `` servicing'' means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

(j) Transition

(1) Originator liability

A person who makes a federally related mortgage loan shall not be liable to a borrower because of a failure of such person to comply with subsection (a) of this section with respect to an application for a loan made by the borrower before the regulations referred to in paragraph (3) take effect.

(2) Servicer liability

A servicer of a federally related mortgage loan shall not be liable to a borrower because of a failure of the servicer to perform

any duty under subsection (b), (c), (d), or (e) of this section that
arises before the regulations referred to in paragraph (3) take
effect.

(3) Regulations and effective date

The Secretary shall, by regulations that shall take effect not
later than April 20, 1991, establish any requirements necessary to
carry out this section. Such regulations shall include the model
disclosure statement required under subsection (a)(2) of this
section.

(Pub. L. 93-533, Sec. 6, as added Pub. L. 101-625, title IX, Sec. 941,
Nov. 28, 1990, 104 Stat. 4405; amended Pub. L. 102-27, title III,
Sec. 312(a), Apr. 10, 1991, 105 Stat. 154; Pub. L. 103-325, title III,
Sec. 345, Sept. 23, 1994, 108 Stat. 2239; Pub. L. 104-208, div. A, title
II, Sec. 2103(a), Sept. 30, 1996, 110 Stat. 3009-399.)

Prior Provisions

A prior section 2605, Pub. L. 93-533, Sec. 6, Dec. 22, 1974, 88
Stat. 1726, related to advanced itemized disclosure of settlement costs
by the lender and liability of the lender for failure to comply, prior
to repeal by Pub. L. 94-205, Sec. 5, Jan. 2, 1976, 89 Stat. 1158.

Amendments

1996--Subsec. (a). Pub. L. 104-208 amended heading and text of
subsec. (a) generally. Prior to amendment, text consisted of pars. (1)
to (3) relating to requirements for lenders of federally related
mortgage loans to disclose to applicants whether servicing of such loan
may be assigned, sold, or transferred, directed Secretary to develop
model disclosure statement, and required signature of applicant on all
such disclosure statements.
1994--Subsec. (a)(1)(B). Pub. L. 103-325 substituted ``(B) at the
choice of the person making a federally related mortgage loan--
``(i) for each of the most recent"
for ``(B) for each of the most recent", redesignated cls. (i) and (ii)
as subcls. (I) and (II), respectively, and realigned margins,
substituted ``or" for ``and" at end of subcl. (II), and added cl.
(ii).
1991--Subsec. (j). Pub. L. 102-27 added subsec. (j).

Section Referred to in Other Sections

This section is referred to in sections 2609, 2610, 2614 of this
title; title 15 section 1641.

**U.S. Department of Housing and Urban Development**
451 7th Street, S.W., Washington, DC 20410
Telephone: (202) 708-1112 Find the address of a HUD office near you

# EXHIBIT # 12

Morningstar® Document Research℠

# FORM 424B5

## CWALT INC - N/A

**Filed: January 03, 2007 (period: )**

Prospectus filed pursuant to Rule 424(b)(5)

**PROSPECTUS SUPPLEMENT**
(To Prospectus dated November 14, 2006)

**$1,089,000,100**
(Approximate)
**CWALT, INC.**
Depositor



**HOME LOANS**
Sponsor and Seller

**Countrywide Home Loans Servicing LP**
Master Servicer

**Alternative Loan Trust 2006-OC11**
Issuing Entity

**Mortgage Pass-Through Certificates, Series 2006-OC11**
Distributions payable monthly, beginning January 25, 2007

The issuing entity will issue certificates including the following classes of certificates that are offered pursuant to this prospectus supplement and the accompanying prospectus:

| Class | Initial Class Certificate Balance(1) | Price to Public | Underwriting Discount | Proceeds to Depositor(2) | Class | Initial Class Certificate Balance(1) | Price to Public | Underwriting Discount | Proceeds to Depositor(2) |
|---|---|---|---|---|---|---|---|---|---|
| Class 1-A | $ 224,171,000 | 100.00000% | 0.20450% | 99.79550% | Class M-2 | $ 17,050,000 | 100.00000% | 0.31250% | 99.68750% |
| Class 2-A-1 | $ 313,135,200 | 100.00000% | 0.25000% | 99.75000% | Class M-3 | $ 9,900,000 | 100.00000% | 0.39042% | 99.60958% |
| Class 2-A-2A | $ 317,808,100 | 100.00000% | 0.25000% | 99.75000% | Class M-4 | $ 8,800,000 | 100.00000% | 0.39042% | 99.60958% |
| Class 2-A-2B | $ 35,312,000 | 100.00000% | 0.25000% | 99.75000% | Class M-5 | $ 6,050,000 | 100.00000% | 0.39042% | 99.60958% |
| Class 2-A-3 | $ 118,823,700 | 100.00000% | 0.26667% | 99.73333% | Class M-6 | $ 7,150,000 | 100.00000% | 0.39042% | 99.60958% |
| Class A-R | $ 100 | (3) | (3) | (3) | Class M-7 | $ 6,600,000 | 100.00000% | 0.39042% | 99.60958% |
| Class M-1 | $ 18,700,000 | 100.00000% | 0.30000% | 99.70000% | Class M-8 | $ 5,500,000 | 99.44912% | 0.39042% | 99.60958% |

**Consider carefully the risk factors beginning on page S-20 in this prospectus supplement and on page 2 in the prospectus.**

The certificates represent obligations of the issuing entity only and do not represent an interest or obligation of CWALT, Inc., Countrywide Home Loans, Inc. or any of their affiliates.

(1) This amount is subject to a permitted variance in the aggregate of plus or minus 10%.

(2) Before deducting expenses payable by the depositor estimated to be approximately $564,203 in the aggregate.

(3) The Class A-R Certificates will be offered to the public at varying prices to be determined at the time of sale.

The classes of certificates offered by this prospectus supplement, together with their pass-through rates, the method of calculating their pass-through rates and their initial ratings, are listed in the tables under "Summary — Description of the Certificates" on page S-8 of this prospectus supplement.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity. The certificates represent interests in a pool consisting of two loan groups, each consisting primarily of 30-year conventional fixed and adjustable-rate mortgage loans secured by first liens on one- to four-family residential properties.

Credit enhancement for the certificates consists of:

- Overcollateralization,

- Excess Cashflow; and

- Subordination.

The credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for the certificates is described in more detail in this prospectus supplement.

The offered certificates (other than the Class A-R Certificates) also will have the benefit of an interest rate swap contract.

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.**

The offered certificates will be purchased by Countrywide Securities Corporation on or about December 29, 2006.

## Countrywide Securities Corporation

December 27, 2006

## Table of Contents

| | Page |
|---|---|
| **Prospectus Supplement** | |
| Summary | S-4 |
| Summary of Transaction Parties | S-19 |
| Risk Factors | S-20 |
| The Mortgage Pool | S-32 |
| General | S-32 |
| Assignment of the Mortgage Loans | S-63 |
| Conveyance of Supplemental Mortgage Loans | S-64 |
| Underwriting Process - Countrywide Home Loans, Inc. | S-66 |
| Underwriting Process - General | S-71 |
| Servicing of Mortgage Loans | S-71 |
| General | S-71 |
| Countrywide Home Loans Servicing LP | S-72 |
| Countrywide Home Loans | S-72 |
| Mortgage Loan Production | S-73 |
| Loan Servicing | S-74 |
| Collection Procedures | S-74 |
| Servicing Compensation and Payment of Expenses | S-75 |
| Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans | S-77 |
| Advances | S-77 |
| Certain Modifications and Refinancings | S-78 |
| The Issuing Entity | S-78 |
| Static Pool Data | S-79 |
| Description of the Certificates | S-79 |
| General | S-79 |
| Calculation of Class Certificate Balance | S-80 |
| Book-Entry Certificates; Denominations | S-81 |
| Payments on Mortgage Loans; Accounts | S-85 |
| The Swap Account | S-87 |
| Investments of Amounts Held in Accounts | S-88 |
| Fees and Expenses | S-89 |
| Distributions | S-92 |
| Interest | S-93 |
| Principal | S-96 |
| Residual Certificates | S-104 |
| Overcollateralization Provisions | S-104 |
| The Swap Contract | S-105 |
| Calculation of One-Month LIBOR | S-111 |
| Carryover Reserve Fund | S-112 |
| Applied Realized Loss Amounts | S-112 |
| Reports to Certificateholders | S-113 |
| Structuring Assumptions | S-114 |
| Optional Purchase of Defaulted Loans and Certain Delinquent Loans | S-132 |
| Optional Termination | S-132 |
| Events of Default; Remedies | S-133 |
| Certain Matters Regarding the Master Servicer, the Depositor, the Sellers and the NIM Insurer | S-133 |
| The Trustee | S-133 |
| Voting Rights | S-135 |

Restrictions on Transfer of the Class A-R Certificates                                    S-135
Ownership of the Residual Certificates                                                    S-135
Restrictions on Investment, Suitability Requirements                                      S-135
Rights of the NIM Insurer Under the Pooling and Servicing Agreement                       S-135
Yield, Prepayment and Maturity Considerations                                             S-136
Prepayment Considerations and Risks                                                       S-136
Weighted Average Lives of the Offered Certificates                                        S-138
Decrement Tables                                                                          S-139
Last Scheduled Distribution Date                                                          S-146
Use of Proceeds                                                                           S-146
Legal Proceedings                                                                         S-146
Material Federal Income Tax Consequences                                                  S-147
Taxation of the REMIC Regular Interest Components of the Regular Certificates             S-147
Taxation of the Net Rate Carryover Components of the Regular Certificates                 S-149
Residual Certificates                                                                     S-150
Other Taxes                                                                               S-151
ERISA Considerations                                                                      S-152
Method of Distribution                                                                    S-154
Legal Matters                                                                             S-155
Ratings                                                                                   S-155
Index of Defined Terms                                                                    S-157
Annex I                                                                                    I-1

S-2

Powered by Morningstar® Document Research℠

**Page**

**Prospectus**

| | |
|---|---|
| Important Notice About Information in This Prospectus and Each Accompanying Prospectus Supplement | 1 |
| Risk Factors | 2 |
| The Trust Fund | 12 |
| Use of Proceeds | 24 |
| The Depositor | 24 |
| Loan Program | 25 |
| Static Pool Data | 27 |
| Description of the Securities | 28 |
| Credit Enhancement | 45 |
| Yield, Maturity and Prepayment Considerations | 51 |
| The Agreements | 54 |
| Certain Legal Aspects of the Loans | 73 |
| Material Federal Income Tax Consequences | 81 |
| Other Tax Considerations | 102 |
| ERISA Considerations | 103 |
| Legal Investment | 106 |
| Method of Distribution | 107 |
| Legal Matters | 108 |
| Financial Information | 108 |
| Rating | 109 |
| Index to Defined Terms | 110 |

S-3

Powered by Morningstar® Document Research℠

### Summary

This summary highlights selected information from this document and does not contain all of the information that you need to consider in making your investment decision. To understand all of the terms of an offering of the certificates, read carefully this entire document and the accompanying prospectus.

While this summary contains an overview of certain calculations, cash flow priorities and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities and other information in this prospectus supplement and the accompanying prospectus before making any investment decision.

#### Issuing Entity

Alternative Loan Trust 2006-OC11, a common law trust formed under the laws of the State of New York.

*See "The Issuing Entity" in this prospectus supplement.*

#### Depositor

CWALT, Inc., a Delaware corporation, is a limited purpose finance subsidiary of Countrywide Financial Corporation. Its address is 4500 Park Granada, Calabasas, California 91302, and its telephone number is (818) 225-3000.

*See "The Depositor" in the prospectus.*

#### Sponsor and Sellers

Countrywide Home Loans, Inc. will be the sponsor of the transaction and a seller of a portion of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation or one of its subsidiaries, which acquired the mortgage loans they are selling directly from Countrywide Home Loans, Inc.

*See "Servicing of Mortgage Loans — Countrywide Home Loans" in this prospectus supplement.*

#### Originators

Set forth below are the identities of those originators that originated more than 10% of the initial mortgage loans in a loan group, together with the percentages of initial mortgage loans, by principal balance originated by each such originator:

| Originator | Loan Group 1 | Loan Group 2 |
|---|---|---|
| Countrywide Home Loans | 9.84% | 28.95% |
| Decision One Mortgage Company LLC | 17.44% | 12.83% |
| First Bank | 19.28% | 11.27% |
| Silver State Financial Services, Inc. | 12.00% | 7.50% |
| SouthStar Funding, LLC | 13.32% | 5.55% |

The remainder of the initial mortgage loans in each loan group were originated by various other originators, which, individually, originated less than 10% of the initial mortgage loans in each loan group.

*See "The Mortgage Pool — Underwriting Process—Countrywide Home Loans, Inc." in this prospectus supplement.*

#### Master Servicer

Countrywide Home Loans Servicing LP

*See "Servicing of Mortgage Loans — Countrywide Home Loans Servicing LP" in this prospectus supplement.*

**Trustee**

The Bank of New York

*See "Description of the Certificates — The Trustee" in this prospectus supplement.*

**Swap Counterparty**

Deutsche Bank AG, New York Branch

*See "Description of the Certificates — The Swap Contract" in this prospectus supplement.*

S-4

Source: CWALT INC, 424B5, January 03, 2007                    Powered by Morningstar® Document Research℠

*The NIM Insurer*

After the closing date, a separate trust or trusts (or other form of entity) may be established to issue net interest margin securities secured by all or a portion of the Class P and Class C Certificates. Those net interest margin securities may have the benefit of one or more financial guaranty insurance policies that guaranty payments on those securities. The insurer or insurers issuing these financial guaranty insurance policies are referred to in this prospectus supplement as the "NIM Insurer." The references to the NIM Insurer in this prospectus supplement apply only if the net interest margin securities are so insured.

Any NIM Insurer will have a number of rights under the pooling and servicing agreement that will limit and otherwise affect the rights of the holders of the offered certificates. Any insurance policy issued by a NIM Insurer will not cover, and will not benefit in any manner whatsoever, the offered certificates.

*See "Risk Factors—Rights of the NIM Insurer" in this prospectus supplement.*

**Pooling and Servicing Agreement**

The pooling and servicing agreement among the sellers, the master servicer, the depositor and the trustee, under which the issuing entity will be formed.

**Cut-off Date**

For any mortgage loan conveyed to the issuing entity on the closing date, the later of December 1, 2006 and the date of origination for that mortgage loan (the "initial cut-off date").

For any mortgage loan conveyed to the issuing entity after the closing date, the later of the date of origination for that mortgage loan and the first day of the month of the conveyance to the issuing entity.

**Pre-Funding**

If the aggregate stated principal balance as of the initial cut-off date of the mortgage loans in loan group 1 and loan group 2 conveyed to the issuing entity on the closing date is less than $244,327,710 and $855,672,290, respectively, an account (the "*pre-funding account*") will be established with the trustee on the closing date and funded in an amount equal to any such difference (referred to as the "*pre-funded amount*").

*Pre-Funded Amount:*

As of the date of this prospectus supplement, the pre-funded amount to be deposited in the pre-funding account is expected to be approximately $57,008,092 and $212,897,012 with respect to the group 1 mortgage loans and the group 2 mortgage loans, respectively.

*Funding Period:*

If there is a pre-funded amount deposited into the pre-funding account on the closing date, the funding period will begin on the closing date and end on the earlier of (x) the date the amount in the pre-funding account is less than $150,000 and (y) January 31, 2007.

*Use of Pre-Funded Amount:*

The portion of the pre-funded amount deposited in the pre-funding account on the closing date with respect to a loan group on the closing date is expected to be used to purchase supplemental mortgage loans for that loan group. Any pre-funded amount with respect to a loan group not used during the funding period to purchase supplemental mortgage loans for that loan group will be distributed to holders of the related classes of senior certificates as a prepayment of principal on the distribution date immediately following the end of the funding period.

*Restrictions on Supplemental Mortgage Loan Purchases:*

Purchases of supplemental mortgage loans are subject to the same criteria as the initial mortgage loans and additional restrictions related to the composition of the related loan group following the acquisition of the supplemental mortgage loans, as described in this prospectus supplement.

*Capitalized Interest Account:*

Because some of the mortgage loans may not be acquired by the issuing entity until after the closing date, there may not be sufficient interest collections from mortgage loans to pay all the interest due on the related certificates on the first and possibly the second distribution dates. If a pre-funding account is funded, a capitalized interest account will be established and funded on the closing date to cover those shortfalls.

S-5

Powered by Morningstar® Document Research℠

*Closing Date*

On or about December 29, 2006.

*The Mortgage Loans*

The mortgage pool will consist primarily of 30-year mortgage loans secured by first liens on one- to four-family residential properties. The mortgage loans will be divided into two groups. Each group of mortgage loans is referred to as a "loan group." Loan group 1 will consist of conforming balance fixed and adjustable rate mortgage loans and loan group 2 will consist of fixed and adjustable rate mortgage loans. The mortgage loans have mortgage rates that either (i) are fixed for the life of the mortgage loan, (ii) adjust semiannually or annually or (iii) have a fixed rate period of two, three, five, seven or ten years after the first payment date of each mortgage loan and thereafter adjust semi-annually or annually, in each case based on a specified index.

The statistical information presented in this prospectus supplement is as of the initial cut-off date. The depositor believes that the information set forth in this prospectus supplement regarding the initial mortgage loans as of the initial cut-off date is representative of the characteristics of the mortgage loans that will be delivered on the closing date. However, the statistical information presented in this prospectus supplement does not reflect all of the mortgage loans that may be included in the issuing entity. Additional mortgage loans may be included during the funding period. Further, certain mortgage loans may prepay or may be determined not to meet the eligibility requirements for inclusion in the final mortgage pool. A limited number of mortgage loans may be substituted for the initial mortgage loans that are described in this prospectus supplement. Any addition or substitution will not result in a material difference in the final mortgage pool although the initial cut-off date information regarding the actual initial mortgage loans may vary somewhat from the information regarding the initial mortgage loans presented in this prospectus supplement.

As of the initial cut-off date, the mortgage pool had an aggregate stated principal balance of approximately $830,094,897, approximately $187,319,618 of which are group 1 mortgage loans and approximately $642,775,278 of which are group 2 mortgage loans. All of the mortgage loans in loan group 1 will have original principal balances that conform to the guidelines of Fannie Mae and Freddie Mac.

As of the initial cut-off date, the initial mortgage loans in loan group 1 had the following characteristics:

| | |
|---|---|
| Aggregate Current Principal Balance | $187,319,618 |
| Geographic Concentrations in excess of 10%: | |
| California | 27.88% |
| Florida | 12.06% |
| Weighted Average Original LTV Ratio | 77.87% |
| Weighted Average Mortgage Rate | 7.357% |
| Range of Mortgage Rates | 4.750% to 10.780% |
| Average Current Principal Balance | $218,067 |
| Range of Current Principal Balances | $39,907 to $738,813 |
| Weighted Average Remaining Term to Maturity | 360 months |
| Weighted Average FICO Credit Score | 692 |
| Adjustable Rate Mortgage Loans Only | |
| Weighted Average Gross Margin | 3.545% |
| Weighted Average Maximum Mortgage Rate | 12.687% |
| Weighted Average Minimum Mortgage Rate | 3.935% |

S-6

Powered by Morningstar® Document Research℠

As of the initial cut-off date, the initial mortgage loans in loan group 2 had the following characteristics:

| | |
|---|---:|
| Aggregate Current Principal Balance | $642,775,278 |
| Geographic Concentrations in excess of 10%: | |
| California | 45.34% |
| Weighted Average Original LTV Ratio | 79.19% |
| Weighted Average Mortgage Rate | 7.137% |
| Range of Mortgage Rates | 3.875% to 11.999% |
| Average Current Principal Balance | $322,678 |
| Range of Current Principal Balances | $49,930 to $2,795,000 |
| Weighted Average Remaining Term to Maturity | 358 months |
| Weighted Average FICO Credit Score | 689 |
| Adjustable Rate Mortgage Loans Only | |
| Weighted Average Gross Margin | 3.454% |
| Weighted Average Maximum  Mortgage Rate | 12.504% |
| Weighted Average Minimum  Mortgage Rate | 3.727% |

*See "The Mortgage Pool" in this prospectus supplement.*

Source: CWALT INC, 424B5, January 03, 2007

Powered by Morningstar® Document Research℠

*Description of the Certificates*

The issuing entity will issue the following classes of certificates:

| Class | Initial Class Certificate Balance (1) | Type | Initial Rating (Moody's) (2) | Initial Rating (S&P) (2) |
|---|---|---|---|---|
| *Offered Certificates* | | | | |
| Class 1-A | $    224,171,000 | Senior/Floating Pass-Through Rate | Aaa | AAA |
| Class 2-A-1 | $    313,135,200 | Senior/Floating Pass-Through Rate | Aaa | AAA |
| Class 2-A-2A | $    317,808,100 | Senior/Floating Pass-Through Rate/Super Senior | Aaa | AAA |
| Class 2-A-2B | $    35,312,000 | Senior/Floating Pass-Through Rate/Support | Aaa | AAA |
| Class 2-A-3 | $    118,823,700 | Senior/Floating Pass-Through Rate | Aaa | AAA |
| Class A-R | $    100 | Senior/REMIC Residual | Aaa | AAA |
| Class M-1 | $    18,700,000 | Subordinate/Floating Pass Through Rate | Aa1 | AA+ |
| Class M-2 | $    17,050,000 | Subordinate/Floating Pass Through Rate | Aa2 | AA+ |
| Class M-3 | $    9,900,000 | Subordinate/Floating Pass Through Rate | Aa3 | AA |
| Class M-4 | $    8,800,000 | Subordinate/Floating Pass Through Rate | A1 | AA |
| Class M-5 | $    6,050,000 | Subordinate/Floating Pass Through Rate | A2 | AA- |
| Class M-6 | $    7,150,000 | Subordinate/Floating Pass Through Rate | A3 | A+ |
| Class M-7 | $    6,600,000 | Subordinate/Floating Pass Through Rate | Baa1 | A |
| Class M-8 | $    5,500,000 | Subordinate/Floating Pass Through Rate | Baa2 | A- |
| *Non-Offered Certificates (3)* | | | | |
| Class P | $    100(4) | Prepayment Charges | NR | NR |
| Class C | N/A | Residual | NR | NR |

---

(1)   This amount is subject to a permitted variance in the aggregate of plus or minus 10% depending on the amount of mortgage loans actually delivered on the closing date.

(2)   The offered certificates will not be offered unless they are assigned the indicated ratings by Moody's Investors Service, Inc. ("*Moody's*") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("*S&P*"). "NR" indicates that the agency was not asked to rate the certificates. A rating is not a recommendation to buy, sell or hold securities. These ratings may be lowered or withdrawn at any time by either of the rating agencies. *See "Ratings" in this prospectus supplement.*

(3)   The Class P and Class C Certificates are not offered by this prospectus supplement. Any information contained in this prospectus supplement with respect to the Class P and Class C Certificates is provided only to permit a better understanding of the offered certificates.

(4)   The Class P Certificates also have a notional amount equal to the aggregate stated principal balance of the initial mortgage loans as of the initial cut-off date with prepayment charges.

Source: CWALT INC, 424B5, January 03, 2007                                    Powered by Morningstar® Document Research℠

The certificates also will have the following characteristics:

| Class | Related Loan Group | Pass-Through Rate On or Before Before Optional Termination Date (1) | Pass-Through Rate After Optional Termination Date (1) | Interest Accrual Period | Interest Accrual Convention |
|---|---|---|---|---|---|
| *Offered Certificates* | | | | | |
| Class 1-A | 1 | LIBOR + 0.160% | LIBOR + 0.320% | (2) | Actual/360 (3) |
| Class 2-A-1 | 2 | LIBOR + 0.100% | LIBOR + 0.200% | (2) | Actual/360 (3) |
| Class 2-A-2A | 2 | LIBOR + 0.170% | LIBOR + 0.340% | (2) | Actual/360 (3) |
| Class 2-A-2B | 2 | LIBOR + 0.220% | LIBOR + 0.440% | (2) | Actual/360 (3) |
| Class 2-A-3 | 2 | LIBOR + 0.240% | LIBOR + 0.480% | (2) | Actual/360 (3) |
| Class A-R | 1 | (4) | (4) | N/A | N/A |
| Class M-1 | 1 and 2 | LIBOR + 0.290% | LIBOR + 0.435% | (2) | Actual/360 (3) |
| Class M-2 | 1 and 2 | LIBOR + 0.300% | LIBOR + 0.450% | (2) | Actual/360 (3) |
| Class M-3 | 1 and 2 | LIBOR + 0.320% | LIBOR + 0.480% | (2) | Actual/360 (3) |
| Class M-4 | 1 and 2 | LIBOR + 0.410% | LIBOR + 0.615% | (2) | Actual/360 (3) |
| Class M-5 | 1 and 2 | LIBOR + 0.440% | LIBOR + 0.660% | (2) | Actual/360 (3) |
| Class M-6 | 1 and 2 | LIBOR + 0.500% | LIBOR + 0.750% | (2) | Actual/360 (3) |
| Class M-7 | 1 and 2 | LIBOR + 1.150% | LIBOR + 1.725% | (2) | Actual/360 (3) |
| Class M-8 | 1 and 2 | LIBOR + 1.500% | LIBOR + 2.250% | (2) | Actual/360 (3) |
| *Non-Offered Certificates* | | | | | |
| Class P | 1 and 2 | N/A | N/A | N/A | N/A |
| Class C | 1 and 2 | N/A | N/A | N/A | N/A |

(1) The pass-through rates on the LIBOR certificates may adjust monthly based on the level of one-month LIBOR, subject to a cap. LIBOR for the related interest accrual period is calculated as described in this prospectus supplement under "*Description of the Certificates - Calculation of One-Month LIBOR.*"

(2) The interest accrual period for any distribution date will be the period commencing on the distribution date in the month prior to the month in which that distribution date occurs (or commencing on the closing date, in the case of the first distribution date) and ending on the day immediately prior to that distribution date.

(3) Interest will accrue at the rate described in this table on the basis of a 360-day year and the actual number of days that elapsed in the interest accrual period.

(4) The Class A-R Certificates will not accrue any interest.

*See "Description of the Certificates" in this prospectus supplement.*

S-9

## Designations

We sometimes use the following designations to refer to the specified classes of certificates in order to aid your understanding of the offered certificates.

| Designation | Classes of Certificates |
|---|---|
| Senior Certificates | Class 1-A, Class 2-A-1, Class 2-A-2A, Class 2-A-2B, Class 2-A-3 and Class A-R Certificates |
| Group 2 Senior Certificates | Class 2-A-1, Class 2-A-2A, Class 2-A-2B and Class 2-A-3 Certificates |
| Subordinated Certificates | Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates |
| Senior LIBOR Certificates | Class 1-A Certificates and Group 2 Senior Certificates |
| LIBOR Certificates | Senior LIBOR Certificates and Subordinated Certificates |
| Offered Certificates | Senior Certificates and Subordinated Certificates |

### Record Date

*LIBOR Certificates*:

The business day immediately preceding a distribution date, or if the LIBOR certificates are no longer book-entry certificates, the last business day of the calendar month preceding the month of that distribution date.

*Class A-R Certificates*:

The last business day of the month preceding the month of the distribution date.

### Denominations

*Offered Certificates (other than the Class A-R Certificates)*:

$25,000 and multiples of $1 in excess thereof.

*Class A-R Certificates*:

Two certificates of $99.99 and $0.01, respectively.

### Registration of Certificates

*Offered Certificates (other than the Class A-R Certificates)*:

Book-entry form. Persons acquiring beneficial ownership interests in the offered certificates (other than the Class A-R Certificates) will hold their beneficial interests through The Depository Trust Company, in the United States, or Clearstream, Luxembourg or the Euroclear System, in Europe.

*Class A-R Certificates*:

Fully registered certificated form. The Class A-R Certificates will be subject to certain restrictions on transfer described in this prospectus supplement and as more fully provided for in the pooling and servicing agreement.

*See "Description of the Certificates — Book-Entry Certificates; Denominations" and "— Restrictions on Transfer of the Class A-R Certificates" in this prospectus supplement.*

### Distribution Dates

Beginning on January 25, 2007, and thereafter on the 25th day of each calendar month, or if the 25th is not a business day, the next business day.

### Last Scheduled Distribution Date

The last scheduled distribution date for each class of offered certificates is the distribution date specified under *"Yield, Prepayment and Maturity Considerations—Last Scheduled Distribution Date"* in this prospectus supplement. Since the rate of distributions in reduction of the class certificate balance of each class of offered certificates will depend on the rate of payment (including prepayments) of the mortgage loans, the class certificate balance of any class could be reduced to zero significantly earlier or later than the last scheduled distribution date.

*See "Yield, Prepayment and Maturity Considerations - Last Scheduled Distribution Date" in this prospectus supplement.*

### Interest Payments

The related interest accrual period, interest accrual convention and pass-through rate for each class of interest-bearing certificates is shown in the table on page S-9.

On each distribution date, holders of each class of LIBOR certificates will be entitled to receive:

S-10

Powered by Morningstar® Document Research℠

- the interest that has accrued at the related pass-through rate during the related interest accrual period on the class certificate balance of such class immediately prior to that distribution date, and

- any interest due on a prior distribution date that was not paid.

For each class of subordinated certificates, any interest carry forward amount (which is interest due on a prior distribution date that was not paid on a prior distribution date) will be payable from excess cashflow as and to the extent described in this prospectus supplement and from payments allocated to the issuing entity (if any) in respect of the swap contract in the manner described in this prospectus supplement.

There are certain circumstances that could reduce the amount of interest paid to you.

*See "Description of the Certificates — Distributions —Interest" in this prospectus supplement.*

### *Principal Payments*

On each distribution date, certificateholders will receive a distribution of principal on their certificates only if there is cash available on that date for the distribution of principal. The priority of distributions will differ as described in this prospectus supplement, depending upon whether a distribution date occurs before the stepdown date, or on or after that date, and will depend on the loss and delinquency performance of the mortgage loans.

*See "Description of the Certificates — Distributions —Principal" in this prospectus supplement.*

### *Amounts Available for Distributions on the Certificates*

#### Amounts Available with respect to Interest Distributions

The amount available for interest distributions on the certificates on any distribution date will be calculated on a loan group by loan group basis and will generally consist of the following amounts with respect to the mortgage loans in a loan group (after fees and expenses as described below are subtracted):

- scheduled payments of interest on the mortgage loans in that loan group collected during the applicable period;

- interest on prepayments on the mortgage loans in that loan group to the extent not allocable to the master servicer as additional servicing compensation;

- interest amounts advanced by the master servicer on the mortgage loans in that loan group and any required compensating interest paid by the master servicer related to voluntary prepayments in full on the mortgage loans;

- liquidation proceeds on the mortgage loans in that loan group during the applicable period (to the extent allocable to interest); and

- for each distribution date during, and the distribution date immediately after the funding period, any amounts required pursuant to the pooling and servicing agreement to be distributed from the capitalized interest account.

#### Amounts Available with respect to Principal Distributions

The amount available for principal distributions on the certificates on any distribution date will be calculated on a loan group by loan group basis and will generally consist of the following amounts with respect to the mortgage loans in a loan group (after fees and expenses as described below are subtracted):

- scheduled payments of principal of the mortgage loans in that loan group collected during the applicable period or advanced by the master servicer;

- prepayments on the mortgage loans in that loan group collected in the applicable period;

- the stated principal balance of any mortgage loans in that loan group repurchased or purchased by a seller or the master servicer, as applicable;

- all proceeds of any primary mortgage guaranty insurance policies and any other insurance policies with respect to the mortgage loans in that loan group, to the extent the proceeds are allocated to principal and are not applied to the restoration of the related mortgaged property or released to the borrower in accordance with the master servicer's normal servicing procedures;

- the excess, if any, of the stated principal balance of a deleted mortgage loan in that loan group over the stated principal balance of the related substitute mortgage loan in that loan group;

S-11

Powered by Morningstar® Document Research℠

- subsequent recoveries with respect to the mortgage loans in that loan group;

- liquidation proceeds on the mortgage loans in that loan group during the applicable period (to the extent allocable to principal);

- for the first distribution date following the funding period, any amounts remaining in the pre-funding account with respect to each loan group (net of any investment income thereon); and

- excess interest (to the extent available) to maintain the targeted overcollateralization level as described under "*Description of the Certificates — Overcollateralization Provisions*" in this prospectus supplement.

<u>Fees and Expenses</u>

The amounts available for distributions on the certificates on any distribution date generally will not include the following amounts calculated on a loan group by loan group basis:

- the master servicing fee and additional servicing compensation (as described in this prospectus supplement under "*Servicing of Mortgage Loans— Servicing Compensation and Payment of Expenses*") due to the master servicer;

- the portion of the trustee fee due to the trustee;

- lender paid mortgage insurance premiums, if any;

- the amounts in reimbursement for advances previously made and other amounts as to which the master servicer and the trustee are entitled to be reimbursed from the Certificate Account pursuant to the pooling and servicing agreement;

- all prepayment charges (which are distributable only to the Class P Certificates);

- all other amounts for which the depositor, a seller, the master servicer or any NIM Insurer is entitled to be reimbursed; and

- the pro rata portion of any net swap payment or any swap termination payment payable to the swap counterparty (other than a swap termination payment resulting from a swap counterparty trigger event).

Any amounts subtracted from the amount available for distribution to the certificateholders will reduce the amount that could have been distributed to the certificateholders.

***Servicing Compensation***

*Master Servicing Fee*:

The master servicer will be paid a monthly fee (referred to as the master servicing fee) with respect to each mortgage loan equal to one-twelfth of the stated principal balance of that mortgage loan multiplied by the applicable master servicing fee rate specified in "*Servicing of Mortgage Loans—Servicing Compensation and Payment of Expenses*". The amount of the master servicing fee is subject to adjustment with respect to certain prepaid mortgage loans, as described under "*Servicing of Mortgage Loans—Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans*" in this prospectus supplement.

*Additional Servicing Compensation*:

The master servicer is also entitled to receive, as additional servicing compensation, all late payment fees, assumption fees and other similar charges (excluding prepayment charges) and all reinvestment income earned on amounts on deposit in certain of the issuing entity's accounts and excess proceeds with respect to mortgage loans as described under "*Servicing of Mortgage Loans— Servicing Compensation and Payment of Expenses*".

*Source and Priority of Distributions*:

The master servicing fee and the additional servicing compensation described above will be paid to the master servicer from collections on the mortgage loans prior to any distributions on the certificates.

*See "Servicing of Mortgage Loans — Servicing Compensation and Payment of Expenses" and "Description of the Certificates — Payments on Mortgage Loans; Accounts" in this prospectus supplement.*

### Priority of Distributions; Distributions of Interest

In general, on any distribution date, the interest funds for both loan groups will be distributed in the following order:

- to the swap account, pro rata based on the interest funds for each loan group, the amount of any net swap payment and any swap termination payment (other than a swap termination payment due to a swap counterparty trigger event) payable to the swap counterparty with respect to such distribution date;

S-12

Powered by Morningstar® Document Research℠

- concurrently, (a) from the interest funds for loan group 1, to the Class 1-A Certificates, current interest and interest carry forward amount and (b) from the interest funds for loan group 2, concurrently, to each class of group 2 senior certificates, current interest and interest carry forward amounts, pro rata based on their respective entitlements;

- concurrently, to each class of senior LIBOR certificates, any remaining current interest and interest carry forward amount not paid pursuant to the prior bullet point, pro rata based on their respective class certificate balances, to the extent needed to pay any current interest and interest carry forward amount for each such class; provided that interest funds remaining after such allocation will be distributed to each class of senior LIBOR certificates with respect to which there remains any unpaid current interest and interest carry forward amount, pro rata, based on the amount of such remaining unpaid current interest and interest carry forward amount;

- sequentially, in order of their distribution priorities, to each class of subordinated certificates, current interest for each such class; and

- any remainder, as part of the excess cashflow.

### Priority of Distributions; Distributions of Principal

#### Effect of the Stepdown Date if a Trigger Event is not in Effect

On any distribution date on or after the stepdown date (and so long as no trigger event is in effect), instead of allocating all amounts distributable as principal on the certificates to the senior classes of certificates until those senior classes are paid in full, a portion of those amounts distributable as principal will be allocated to the subordinated certificates.

The amount allocated to each class of certificates on or after the stepdown date and so long as no trigger event is in effect will be based on the targeted level of overcollateralization and subordination for each class of certificates. These amounts are described in more detail under "*Description of the Certificates — Distributions —Principal*" in this prospectus supplement.

*Trigger Events*:

A "trigger event" refers to certain specified levels of losses and/or delinquencies on the mortgage loans. Prior to the stepdown date or if a trigger event is in effect on or after the stepdown date, all amounts distributable as principal on a distribution date will be allocated first to the senior certificates, until the senior certificates are paid in full, before any distributions of principal are made on the subordinated certificates.

*The Stepdown Date*:

The stepdown date will be the earlier of:

- the distribution date immediately following the distribution date on which the aggregate class certificate balance of the senior certificates is reduced to zero; and

- the later of: (a) the January 2010 distribution date and (b) the first distribution date on which the aggregate class certificate balance of the senior certificates (after calculating anticipated distributions on such distribution date) is less than or equal to 83.50% of the aggregate stated principal balance of the mortgage loans.

On any distribution date prior to the stepdown date or on which a trigger event is in effect, the principal distribution amount from both loan groups will be distributed in the following order:

- concurrently:

1) from the principal distribution amount for loan group 1, in the following order:

a) sequentially:

    (i) to the Class A-R Certificates, until its class certificate balance is reduced to zero; and

    (ii) to the Class 1-A Certificates, until its class certificate balance is reduced to zero; and

b) to the classes of group 2 senior certificates (after the distribution of the principal distribution amount for loan group 2 as described below), to be allocated among such classes of certificates in the order described below, until their respective class certificate balances are reduced to zero; and

S-13

Powered by Morningstar® Document Research℠

2) from the principal distribution amount for loan group 2, in the following order:

  a) to the classes of group 2 senior certificates, to be allocated among such classes of certificates in the order described below, until their respective class certificate balances are reduced to zero; and

  b) to the Class 1-A Certificates (after the distribution of the principal distribution amount for loan group 1 as described above), until its class certificate balance is reduced to zero;

- from the remaining principal distribution amount from both loan groups, sequentially, in order of their distribution priorities, to each class of subordinated certificates, until their respective class certificate balances are reduced to zero; and

- as part of the excess cashflow.

On any distribution date on or after the stepdown date and so long as a trigger event is not in effect, the principal distribution amount from both loan groups will be distributed in the following order:

- in an amount up to the senior principal distribution target amount, pro rata based on the related senior principal distribution allocation amount for the Class 1-A Certificates and the group 2 senior certificates, concurrently:

  1) to the Class 1-A Certificates, in an amount up to the group 1 senior principal distribution amount, until its class certificate balance is reduced to zero, and

  2) to the classes of group 2 senior certificates, in an amount up to the group 2 senior principal distribution amount, to be allocated among such classes of certificates in the order described below, until their respective class certificate balances are reduced to zero;

  *provided*, however, that if (a) the class certificate balance of the Class 1-A Certificates or (b) the aggregate class certificate balance of the group 2 senior certificates is reduced to zero, then any remaining unpaid senior principal distribution target amount will be distributed to the remaining classes of senior certificates after distributions from clauses (1) and (2) above (and, in the case of the group 2 senior certificates, to be allocated among such classes of certificates in the order described below), until their respective class certificate balances are reduced to zero;

- from the remaining principal distribution amount from both loan groups, sequentially, in order of their distribution priorities, to each class of subordinated certificates, the subordinated class principal distribution target amount for each such class, until their respective class certificate balances are reduced to zero; and

- as part of the excess cashflow.

*Group 2 Senior Certificates:*

For each distribution date, amounts in respect of principal to be distributed to the group 2 senior certificates will be distributed sequentially:

- to the Class 2-A-1 Certificates, until its class certificate balance is reduced to zero;

- concurrently, to the Class 2-A-2A and Class 2-A-2B Certificates, pro rata, until their respective class certificate balances are reduced to zero; and

- to the Class 2-A-3 Certificates, until its class certificate balance is reduced to zero.

*The Swap Contract*

Powered by Morningstar® Document Research℠

Countrywide Home Loans has entered into an interest rate swap contract which will be assigned to The Bank of New York, in its capacity as swap contract administrator, on the closing date.

On each distribution date prior to the swap contract termination date, the swap contract administrator will be obligated to pay to the swap counterparty an amount equal to the product of (i) 5.00% per annum, (ii) the lesser of (a) the swap contract notional balance for that distribution date and (b) the aggregate class certificate balance of the LIBOR certificates immediately prior to that distribution date and (iii) the number of days in the related calculation period (calculated on the basis of a 360-day year of twelve 30-day months), divided by 360. In addition, on the business day preceding each distribution date prior to the swap contract termination date, the swap counterparty will be obligated to pay to the swap contract administrator an amount equal to the product of (i) one-month LIBOR (as determined by the swap counterparty), (ii) the lesser of (a) the swap contract notional balance for that distribution date and (b) the aggregate class certificate balance of the LIBOR certificates immediately prior to that distribution date, and (iii) the actual number of days in the related calculation period, divided by 360.

S-14

Powered by Morningstar® Document Research℠

To the extent that the amount payable by the swap contract administrator exceeds the amount payable by the swap counterparty, the trustee will be required to deduct from the available funds for loan group 1 and loan group 2, pro rata, the amount of that excess and, in its capacity as trustee of the swap trust, to remit the amount of that excess to the swap contract administrator for payment to the swap counterparty. To the extent that the amount payable by the swap counterparty exceeds the amount payable by the swap contract administrator, the swap counterparty will be required to pay to the swap contract administrator the amount of that excess. Any net payment received by the swap contract administrator from the swap counterparty will be remitted to the swap trust only to the extent necessary to cover unpaid current interest, interest carry forward amounts, net rate carryover and unpaid realized loss amounts on the LIBOR certificates and to restore and maintain overcollateralization for those certificates. The remaining portion of any net payment received by the swap contract administrator from the swap counterparty will be paid to Countrywide Home Loans and will not be available to cover any amounts on any class of certificates.

See "Description of the Certificates — The Swap Contract" in this prospectus supplement.

### *Credit Enhancement*

Credit enhancements provide limited protection to holders of certain certificates against shortfalls in payments received on the mortgage loans. This transaction employs the following forms of credit enhancement:

#### Overcollateralization

On the closing date, it is expected that the aggregate stated principal balance of the mortgage loans and any pre-funded amount will exceed the initial aggregate class certificate balance of the offered certificates by approximately $10,999,900. This amount is called "*overcollateralization*" and is approximately equal to the initial level of overcollateralization required by the pooling and servicing agreement.

On any distribution date, the amount of overcollateralization (if any) will be available to absorb the losses from liquidated mortgage loans that would otherwise be allocated to the certificates, if those losses are not otherwise covered by excess cashflow (if any) from the mortgage loans. The required level of overcollateralization may change over time.

The mortgage loans are expected to generate more interest than is needed to pay interest on the certificates because the weighted average interest rate of the mortgage loans is expected to be higher than the weighted average pass-through rate on the certificates, plus the weighted average expense fee rate and the effective rate at which any net swap payments may be payable to the swap counterparty. The "expense fee rate" is the sum of the master servicing fee rate, the trustee fee rate and with respect to any mortgage loan covered by a lender paid mortgage insurance policy, the related mortgage insurance premium rate. Any interest payments received in respect of the mortgage loans in excess of the amount that is needed to pay interest on the certificates, and the issuing entity's expenses, will be used to maintain or restore the required level of overcollateralization.

*See "Description of the Certificates—Overcollateralization Provisions" in this prospectus supplement.*

#### Excess Cashflow

Excess cashflow generally refers to the remaining amounts (if any) available for distribution to the certificates after interest distributions have been made and after the principal funds have been distributed.

On any distribution date, the excess cashflow (if any) will be distributed in the following order:

- to the classes of certificates that are entitled to receive principal on that distribution date to the extent necessary to restore or maintain the required level of overcollateralization;

- concurrently, to the classes of senior certificates, pro rata based on the unpaid realized loss amount for each such class, in an amount equal to the unpaid realized loss amount for each such class; provided, however, that any amounts allocable to the Class 2-A-2B Certificates will be allocated first, to the Class 2-A-2A Certificates, in an amount up to the unpaid realized loss amount for such

class;

S-15

Source: CWALT INC, 424B5, January 03, 2007

Powered by Morningstar® Document Research℠

- sequentially, in order of their distribution priorities, to each class of subordinated certificates, in each case first in an amount equal to any interest carry forward amount for each such class and then in an amount equal to the unpaid realized loss amount for each such class;

- concurrently, to the classes of LIBOR certificates, in an amount up to their pro rata share based on their respective class certificate balances, to the extent needed to pay any unpaid net rate carryover for each such class; and then any excess cashflow remaining after such allocation to pay net rate carryover based on class certificate balances of the certificates will be distributed concurrently, to each class of LIBOR certificates with respect to which there remains any unpaid net rate carryover, pro rata, based on the amount of such unpaid net rate carryover;

- to the swap account, in an amount equal to any swap termination payment due to the swap counterparty as a result of a swap counterparty trigger event under the swap contract; and

- to the Class C and Class A-R Certificates, as specified in the pooling and servicing agreement.

### Subordination

The issuance of senior certificates and subordinated certificates by the issuing entity is designed to increase the likelihood that senior certificateholders will receive regular distributions of interest and principal.

The senior certificates will have a distribution priority over the subordinated certificates. With respect to the subordinated certificates, the distribution priority of the Class M Certificates is in ascending order of their numerical class designation.

Subordination is designed to provide the holders of certificates having a higher distribution priority with protection against losses realized when the remaining unpaid principal balance of a mortgage loan exceeds the proceeds recovered upon the liquidation of that mortgage loan. In general, this loss protection is accomplished by allocating realized losses among the subordinated certificates, beginning with the subordinated certificates with the lowest distribution priority, before realized losses on the mortgage loans in a loan group are allocated to the classes of certificates related to that loan group with higher priorities of distribution.

*See "Description of the Certificates — Applied Realized Loss Amounts" in this prospectus supplement and "Description of the Certificates — Overcollateralization Provisions" in this prospectus supplement and "Credit Enhancement" in the prospectus.*

### *Allocation of Losses*

After the credit enhancement provided by excess cashflow and overcollateralization (if any) have been exhausted, collections otherwise payable to the subordinated classes will comprise the sole source of funds from which credit enhancement is provided to the senior certificates. Realized losses are allocated to the subordinated certificates, beginning with the class of subordinated certificates with the lowest distribution priority, until the class certificate balance of that subordinated class has been reduced to zero. If the aggregate class certificate balance of the subordinated certificates is reduced to zero, any realized losses on the mortgage loans in a loan group will then be allocated to the senior certificates related to that loan group on a pro rata basis, except that any realized losses on the mortgage loans in loan group 2 that would otherwise be allocated to the Class 2-A-2A Certificates will instead be allocated to the Class 2-A-2B Certificates, until its class certificate balance is reduced to zero.

*See "Description of the Certificates — Applied Realized Loss Amounts" in this prospectus supplement and "Description of the Certificates — Overcollateralization Provisions" in this prospectus supplement and "Credit Enhancement" in the prospectus.*

### *Advances*

The master servicer will make cash advances with respect to delinquent payments of principal and interest on the mortgage loans to the extent the master servicer reasonably believes that the cash advances can be repaid from future payments on the mortgage loans. These cash advances are only intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses.

*See "Servicing of Mortgage Loans — Advances" in this prospectus supplement.*

S-16

Source: CWALT INC, 424B5, January 03, 2007                                                      Powered by Morningstar® Document Research℠

### Repurchase, Substitution and Purchase of Mortgage Loans

The sellers may be required to repurchase, or substitute with a replacement mortgage loan, any mortgage loan as to which there exists deficient documentation or as to which there has been an uncured breach of any representation or warranty relating to the characteristics of the mortgage loans that materially and adversely affects the interests of the certificateholders in that mortgage loan.

The master servicer may purchase from the issuing entity any mortgage loan that is delinquent in payment by 151 days or more. The master servicer may enter into an agreement with a third party, which may be a certificateholder, granting that party the right to direct the master servicer to exercise its right to purchase those defaulted mortgage loans and requiring that party to purchase those mortgage loans from the master servicer. In addition, if a mortgage loan becomes subject to a repurchase obligation of an unaffiliated seller to Countrywide Home Loans due to a delinquency on a scheduled payment due on or prior to the first scheduled payment owing to the issuing entity, the master servicer will have the option to purchase that mortgage loan until the 270th day following the date on which that mortgage loan becomes subject to that repurchase obligation.

Countrywide Home Loans, Inc. also will be obligated to purchase any mortgage loan with respect to which it has modified the mortgage rate at the request of the borrower. *See "Servicing of Mortgage Loans — Certain Modifications and Refinancings" in this prospectus supplement.*

The purchase price for any mortgage loans repurchased by a seller or purchased by the master servicer will generally be equal to the stated principal balance of the mortgage loan plus interest accrued at the applicable mortgage rate (and in the case of purchases by the master servicer, less the master servicing fee rate).

*See "The Mortgage Pool — General", "— Assignment of the Mortgage Loans" and "Description of the Certificates — Optional Purchase of Defaulted Loans and Certain Delinquent Loans" in this prospectus supplement and "Mortgage Loan Program — Representations by Sellers; Repurchases" in the prospectus.*

### Optional Termination

The holder of the largest percentage interest in the Class C Certificates (the "directing holder") will have the right to instruct the trustee to conduct an auction of all of the remaining assets of the issuing entity on any distribution date on or after the first distribution date on which the aggregate stated principal balance of the mortgage loans and any related real estate owned by the issuing entity is less than or equal to 10% of the sum of (x) the aggregate stated principal balance of the initial mortgage loans as of the initial cut-off date and (y) any pre-funded amount on the closing date. If the first auction is unsuccessful, the auction process may be repeated periodically at the direction of the directing holder until a successful auction is conducted. In addition, if the first auction is unsuccessful, or if the directing holder does not request an auction, then the master servicer will have the option to purchase all of the remaining assets of the issuing entity. Any successful auction of all of the remaining assets of the issuing entity or any purchase of those assets by the master servicer will result in the early retirement of the certificates. The NIM Insurer may also have the right to purchase all of the remaining assets in the issuing entity.

*See "Description of the Certificates — Optional Termination" in this prospectus supplement*

### Tax Status

For federal income tax purposes, the issuing entity (exclusive of the assets held in the pre-funding account, the capitalized interest account and the carryover reserve fund) will consist of one or more REMICs: one or more underlying REMICs (if any) and the master REMIC. The assets of the lowest underlying REMIC in this tiered structure (or the master REMIC if there are no underlying REMICs) will consist of the mortgage loans and any other assets designated in the pooling and servicing agreement. The master REMIC will issue the several classes of offered certificates, which, other than the Class A-R Certificates, will represent regular interests in the master REMIC and the right to receive payments of net rate carryover from excess cashflow and from the swap contract subject to the deemed obligation to make termination payments on the swap contract. The Class A-R Certificates will represent ownership of both the residual interest in the master REMIC and the residual interests in any underlying REMICs.

Powered by Morningstar® Document Research℠

Source: CWALT INC, 424B5, January 03, 2007                                    Powered by Morningstar® Document Research℠